## NEYLAND v. ADAMS.

### No. 3662.

Court of Civil Appeals of Texas. Beaumont.

May 2, 1940.

Rehearing Denied May 15, 1940.

Synnott & Smith, of Jasper, for appellant.

J. R. Beck, of Beaumont, and Adams & Hillin, of Jasper, for appellee.

WALKER, Chief Justice.

The appeal is by writ of error, but the parties will be referred to as appellant and appellee.

In his petition against appellant, A. R. Neyland, appellee, Benjamin Leakye Adams, alleged that appellant operated a grocery store in Jasper, in Jasper county, and that, as an employee of appellant, he received personal injuries as follows: (a) On or about the 15th day of August, A. D. 1937, his hand came in contact with an unguarded electric buzz fan; (b) on or about the 11th day of January, 1938, while attempting to pick up a sack of feed in appellant's store, he stepped on a bag containing banana peelings and, falling, suffered a hernia; (c) on or about the 12th day of March, 1938, while driving one of appellant's delivery trucks, the truck was wrecked and he suffered personal injuries. He plead in detail the negligence against appellant, proximately causing his injuries. On the allegations of appellee's petition, appellant was operating his store within the provisions of our Workmen's Compensation Act, Vernon's Ann.Civ.St. Art. 8306, § 1 et seq. but did not carry compensation insurance. His prayer was for judgment against appellant for damages for the personal injuries suffered by him.

Appellant answered by demurrers, general and special, general denial, and specially that the store where appellee was working was operated by an independent contractor.

Answering special issues, the jury found the following facts: (a) On the 6th day of July, 1937, appellant had a buzz fan without a guard over its metal blades situated over a checking stand in the rear of his Red & White grocery store in Jasper, Jasper County, Texas; on that date, appellee coming in contact with the buzz fan sustained personal injuries; appellant was guilty of negligence in having the buzz fan in its then condition over the checking stand; which negligence was a proximate cause of appellee's injuries; for the injuries so received the jury assessed appellee's damages at the sum of $500. (b) On January 27, 1938, appellee "stepped upon some refuse" in the rear of appellant's store, thrown there by appellant, or one of his employees, and "as result of slipping and falling on said refuse" appellee suffered a hernia; throwing "such refuse upon the floor" was negligence, which was the proximate cause of the personal injury suffered by appellee; for the injuries so received the jury assessed appellee's damages at the sum of $165.

(c) Appellant, or one of his employees, furnished appellee a truck to be used by him in delivering groceries from appellant's store, which was equipped with defective steering gear; while driving this truck appellee had a wreck, and as a result of the wreck sustained injuries; furnishing appellee the defective truck was negligence on the part of appellant, which negligence was the proximate cause of the injuries received by appellee in the truck wreck; for the injuries so received the jury assessed appellee's damages at the sum of $355. The jury found the following additional facts: Appellant operated the store in Jasper on the dates appellee received his injuries, and he had the right to exercise control in the management and operation of the store where appellee was employed. On the three respective dates when he was injured, appellee was an employee of appellant. The injuries received by appellee were not the result of unavoidable accidents. On the undisputed evidence, appellant operated his store within the provisions of the Workmen's Compensation Act, and did not carry compensation insurance. Judgment was entered in appellee's favor against appellant for the $1,000 assessed in his favor by the verdict of the jury.

■ We overrule appellant's assignments that the evidence was insufficient to support the verdict of the jury on the issues of negligence. We give appellee's testimony (Q. & A. reduced to narrative):

(a) "My name is Benjamin Leakye Adams. I know Mr. A. R. Neyland. He fired me about March 12, 1938. Prior to that date I had worked for him seven or eight years. I worked in his store, and drove the delivery truck, and did everything everybody around the store told me to do. I had lots of bosses. The first time I got hurt was in July, 1937, I believe. Mr. Rafe Kirkland, an employee of the store, put a buzz fan on the checking counter where we filled out our orders; Mr. Rafe Kirkland was the butcher in the store. The fan did not have any guards; it had metal blades; it was setting over where I checked out the groceries. I had been to dinner. When I went back, Mr. Billy, the manager, told me there was an order for Mr. Weldon Scott and to rush it on. I went on back there like he told me, rushing; when I went to pick up the box, my hand—I had hold of the box right under the fan, my right hand was hurt. I was

all cut up. That fan had been there where I was hurt ever since the first of the summer. Mr. Neyland's nephew, Mr. Jimmie Braswell, he was helping me fill orders during the summer. I had a little place so hot I spoke about needing a fan back there. Mr. Rafe Kirkland put the fan up there himself. I think the fan had been there ever since 'about sometime in April' and I was injured by it in July. Mr. Neyland was around the store after the fan was put up there. The fan was sticking out there where it could be seen.

(b) "I was hurt again in January, 1938. I had to carry some feed out to deliver. I went back with the sack on my shoulders and somebody had throwed a sack back there and I slipped on it and fell on my back, and the sack of chops fell in the pit of my stomach.

"'Q. What did it do to you? A. My stomach swoll up and the doctor told me it was a hernia.

"'Q. A hernia? A. Yes, sir, told me I ought to be operated on.

"'Q. Yes? A. Mr. Billy said he would see Mr. Neyland—see if he was carrying insurance. He wasn't carrying insurance.

"'Mr. Lanier: Your Honor, we object to what others might have said.

"'The Court: I sustain the objection.

"'Mr. Beck: We admit the objection and ask the Court to instruct the jury to not consider it.

"'The Court (To the jury): You gentlemen disregard what somebody else said.'

"I fell about 5 o'clock in the evening. I had been putting up groceries on the shelves, you know, putting up canned goods, and fixing to start out delivering. I would make several deliveries at one time. The feed was in a little place in the store, just enough room for a person to pass through. I didn't carry the feed out, I fell. I hadn't carried out any feed before I tried to carry out that sack; that was my first feed order. They throw trash and everything in back there all day long; throw trash on the floor in the back end, I don't know who threw the trash. I would sweep up every morning and after that I would start out on deliveries. If I got through delivering about eleven o'clock I would clean up the shelves and re-stock the shelves. Get off at one o'clock to go to dinner. Get back at two and do what deliveries I had. Then mop the store, or something like that. I didn't see the

sack I stepped on; I didn't fall down on purpose, and I didn't fall down willfully. I haven't been operated on.

(c) "The last day I worked for Mr. Neyland was March 12th, Saturday night, 1938. On that day—well, I was in the truck, making deliveries. I was late getting in. A bunch of white ladies had a party and I had to carry around supplies for Monday morning with the truck; when the truck come in the road I planned to make deliveries, I went to turn and to go around a steep embankment and the steering gear locked on me. I shot off over the steep embankment, shot around the corner and it throwed me out through the side glass and cut my back and head. The steering gear on this car had been bad before. Before my accident, I noticed that the steering gear was bad on the truck, and I told Mr. Billy about it. Two weeks before my wreck, I told Mr. Billy that the steering gear was bad and that it should be fixed. He didn't fix it. He said he would have to wait until Mr. Neyland came up. The truck hadn't been fixed. I drove the truck because it was my job, and I didn't run into the ditch and into that tree on purpose and I didn't do it willfully. In the accident, I cut my head and fractured my elbow."

The "Mr. Billy" referred to by appellee in his testimony was Mr. Billy Braswell, who was the manager of appellant's store for 14 or 15 months, covering the period of time when appellee received his three injuries.

It requires no review of authorities to support the conclusion that appellee's evidence raised the issues of negligence and proximate cause submitted by the court's charge, and was sufficient to support the jury's answer to these issues.

■ The evidence also supports the jury's finding that appellee, on the three several dates he was injured, was an employee of appellant. Under all the testimony, the store belonged to appellant, and he owned the stock of goods, and from time to time he employed different men to manage it for him. On this issue appellee testified: "I have seen Mr. Neyland around the store; I was in the store the night that Mr. Billy Braswell took over the store. I heard Mr. Neyland tell Mr. Billy that I was getting $8.00 per week and he raised me to $10.00; that Mr.

Gerald Few was getting $15.00 a week and he told Mr. Billy to raise it to $16.00. Mr. Neyland told me to do things around the store. He would come up on Sundays and see them—tell me to clean it up; 'if I wouldn't be there he would leave word for me to do it,' nearly every Sunday morning I would have to scrub the tile floor of the store and straighten up the store; 'if I wouldn't be there, he (Mr. Neyland) would tell somebody around the store.' One day when Mr. Neyland was in the store he told me he bought a truck, he told me he was going to buy a new truck; he told me to take care of it and everything. 'I was fixing to get fired' and he (Mr. Neyland) told me I wasn't working for the manager but for him. The manager was fixing to fire me for one of his cousins; was going to put one of his cousins in my place. The manager told me he was going to fire me; Mr. Neyland came up that Sunday and told me as long as I drove the truck as well as I was doing nobody could fire me. I always liked Mr. Neyland; I worked for him a long time. I sifted flour for Mr. Neyland. He told me to do it. He would send me sacks of it. He told me himself. I knowed Mr. Neyland owned the store."

■ Appellee's measure of damages was submitted to the jury by the three following questions:

(a) "What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably and fairly compensate the plaintiff, Benjamin Leaky Adams, for injuries, if any, proven to have been received by him on July 6, 1937, as a proximate result of negligence of the defendant or his agents or employees, if any;

(b) "What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably and fairly compensate the plaintiff, Benjamin Leaky Adams, for injuries, if any, proven to have been received by him on January 27, 1938, as a proximate result of such negligence, if any you have found in Special issue No. 11;

(c) "What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably and fairly compensate the plaintiff, Benjamin Leaky Adams, for injuries, if any, proven to have been received by him on

March 12, 1938, as a proximate result of the negligence of the defendant or his employees, *if any?*"

We overrule appellant's exceptions that these issues submit "triple damages." Each question limited the damages to be assessed by the jury, to such amount as would reasonably and fairly compensate appellee for the injury received by him on the dates alleged.

The judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.